CORBETT, Respondent, vs. PHYSICIANS' CASUALTY ASSOCIA-TION OF AMERICA, Appellant.

*February 22—May 8, 1908.*

*Jurisdiction: Defective service: Waiver: Trial on merits participated in under protest: Insurance: Action upon policy: Service on commissioner: Doing business illegally: Estoppel: Impeachment of party's own witness: Evidence: Restricted offer: Ruling: Exception: Scope of review on appeal: Question of fact: Conflicting evidence: Sustaining verdict.*

1. A defendant in an action, to preserve his status as not having been properly served with the summons, must abstain from making any appearance in such action other than to raise the question of jurisdiction of his person.

2. If a defendant who shall not have been efficiently served with the summons, after appearing solely to raise the question in that regard, submits to a trial upon the merits, he cannot thereafter successfully question the jurisdiction of the court as to his person.

3. An exception to an adverse ruling on the objection to jurisdiction for want of an efficient service of the summons and a subsequent trial upon the merits participated in under protest by the one taking such exception, notwithstanding a plea that the right to further insist upon the jurisdictional defect is not waived, does not change the foregoing stated effect of a trial upon the merits.

4. A trial of an action upon the merits under all circumstances precludes a defendant participating therein from subsequently successfully challenging the result upon the ground of want of jurisdiction of the person.

5. The rule in some jurisdictions, that an insurance company doing business in the state in violation of a statute requiring it as a condition precedent thereto to comply with the law qualifying the commissioner of insurance to receive service of a summons in an action against it in regard to such business, is estopped from successfully claiming in such action that such commissioner was not so qualified, is recognized but the court is not committed thereto.

6. An insurance company which makes a contract of insurance with a resident of this state in violation of the statute, sec. 1978, Stats. (1898), prohibiting it from doing so, is estopped from raising the question of such violation to avoid liability on such contract, in case of the assured having participated in the transaction without knowledge, actual or constructive, of the facts.

7. The dominant purpose of such a statute is to protect residents of the state from being imposed upon by foreign insurance companies. In case any such company offers to do business with one within such protection, it holds itself out as having qualified to do such business, and the resident in the absence of knowledge, actual or constructive, to the contrary, may safely act upon the faith thereof.

8. The mere circumstance of an insurance corporation which is not qualified to transact business with a resident of this state, negotiating successfully with such resident in reference to a contract of insurance, using the United States mail as a medium of communication, does not efficiently impair the presumption, from the standpoint of the assured, that the corporation is qualified to do so.

9. A party to an action may call and examine upon the trial, as a witness, an officer of a corporation adverse party, as under cross-examination and thereafter rebut such witness's evidence by counter or impeaching testimony.

Corbett v. Physicians' Casualty Asso. 135 Wis. 505.

10. Under the foregoing rule it is proper to prove that the adverse witness, prior to his being called, made statements inconsistent with those made on his examination.

11. If evidence upon a trial is specially restricted by the offer and the ruling receiving it to a particular purpose, as that of impeachment, the question of whether the ruling was erroneous turns on whether the evidence was competent for such purpose.

12. In case of evidence upon a trial being admitted for a particular purpose only, it cannot properly be considered for any other purpose in support of the judgment, or the judgment be reversed upon the ground that the evidence was improper for such other purpose.

13. The verdict of a jury on any controverted question of fact cannot be reversed on appeal, if there was any credible evidence to support it.

[Syllabus by Marshall, J.]


Appeal from a judgment of the circuit court for Sheboygan county: Michael Kirwan, Circuit Judge. *Affirmed.*

Action to recover on an accident insurance policy issued on the mutual assessment plan.

The contract secured to plaintiff, as beneficiary, the sum of $3,000 in case of the death by accidental means of George W. Corbett, her husband. The complaint contained all allegations essential to a recovery. The answer stated three defenses, as follows, in effect: (1) The defendant is a Nebraska corporation which has never complied with the laws of this state authorizing service of process upon it by serving upon the commissioner of insurance and the only service made was of that character; (2) without waiving the plea to the jurisdiction of the court the defendant shows that it never qualified to do business in this state and, therefore, the making of the insurance contract was prohibited by sec. 1978, Stats. (1898), and is not enforceable in the courts of this state; (3) without waiving any right under the foregoing the allegations of the complaint as to the assured being a member in good standing of the association at the time he was injured are denied, and it is alleged that he was not such member by

reason of his having failed to pay the last assessment upon his policy, which was due five days before his death, prior to the date of his injury.    There were other allegations in the answer to the merits and a reply so that the issues as made up for trial involved these disputed matters: Did the court obtain jurisdiction of the defendant and the subject of the action by service of the summons upon the insurance commissioner under sec. 1955f, Stats. (1898)?   If such jurisdiction was obtained, it being admitted that the defendant was a Nebraska corporation and not competent to do business in this state by reason of its having failed to comply with the law in that regard, was the policy contract, though good in Nebraska, one enforceable at the suit of plaintiff in this state, under the circumstances, if the assured was a member of the association in good standing at the time of the accident?   Was the assured such member, having paid the assessment upon his certificate due December 10, 1905, before he was injured.   If he did not so make such payment, did he make it thereafter, and was the default waived?

The plea to the jurisdiction was tried first and overruled. Defendant by its counsel excepted to the ruling.   No specific objection was made to then proceeding to a trial upon the merits, which was done.    Before the hearing commenced there was a stipulation that the jurisdictional matter should first be disposed of, and then, if the decision should be adverse to the defendant, the trial should proceed on the merits.

It appeared by the evidence and the pleadings, beyond controversy, that the association at the time of the accident had some fifty members in this state; that it was not qualified under the law to do business in this state; that it had no agent or place of business therein and conducted all its transactions by means of the United States mail.    There was evidence further to this effect: The association, as was customary, issued the certificate to the assured and transmitted the same to him by mail in response to his application likewise re-

ceived.   The customary way in which the assured had made his payments was by sending checks through the mail.   The following by-law was a part of the contract:

"Sec. 2.  Upon receiving notice of an assessment, it is the duty of each member to remit promptly. to the secretary-treasurer.   Any member who shall not. remit the amount of his assessment when due, shall become suspended, and will not be entitled to any benefits of the association until his certificate of membership shall have been reinstated, as hereinafter provided.   Any such suspended member may be reinstated to membership upon the payment of the amount of the delinquent assessment, together with the amount of such other calls as may have been made upon the members of the association, after such member became suspended."

The last assessment upon the certificate was payable December 10, 1905.   A check dated December 10, 1905, signed by the assured for the amount- thereof,. inclosed in a letter dated December 13, 1905, was deposited in the postoffice, duly addressed to the association, or its proper officer, and was thereafter received and put in process of collection before such association knew of the accident.   Such accident occurred December 15, 1905, about 10 o'clock in the forenoon.   The assured, upon it happening, became unconscious. He so remained until he died.   The association received notice of the accident the day before the check was paid.   It received and retained the money till some time after its officer, duly authorized in the premises, visited Wisconsin and made a personal examination into the merits of plaintiff's claim, when the same was tendered back to the plaintiff in her capacity as administratrix of her husband's estate. There was a controversy on the evidence as to whether the letter containing the check was deposited in the postoffice prior to the accident and also as to whether the same was received and placed in course of collection prior thereto. There was no evidence showing, or tending to show affirmatively, that the assured, when he became a member of the as-

sociation or at any time thereafter, knew that it had not complied with the laws of the state of Wisconsin qualifying it to do business therein.

The jury rendered the following verdict:

"(1) Was the check which is in evidence and bears date of December 10, 1905, signed by plaintiff's husband, George W. Corbett, before he received the injury in the forenoon of December 15, 1905, which caused his death? *A.* Yes.

"(2) Was the letter in which said check was inclosed when received by the defendant, deposited and left, or caused to be deposited and left, by said George W. Corbett, in the postoffice in Plymouth, Wisconsin, to be forwarded by mail, before the time when he received said injury? *A.* Yes.

"(3) Was said check received by defendant, at Omaha, Nebraska, before the time when said George W. Corbett received said injury? *A.* Yes.

"(4) (Withdrawn and not submitted.)

"(5) Was the letter which is dated December 13, 1905, in which said check was inclosed when received by defendant, written or caused to be written by said George W. Corbett? *A.* Yes.

"(6) Before said check was deposited by defendant in the bank at Omaha, on December 18, 1905, did defendant, through its secretary and treasurer, E. E. Elliott, have knowledge or information that said George W. Corbett had received said injury? *A.* (by the court by consent of counsel) No.

"(7) Before said check was paid by the bank at Plymouth, Wisconsin, on December 21, 1905, did defendant, through its secretary and treasurer, E. E. Elliott, have knowledge or information that said George W. Corbett had received said injury? *A.* (by the court by consent of counsel) Yes, the notice of injury was received by defendant on December 20, 1905.

"(8) Did E. E. Elliott, the secretary and treasurer of the defendant corporation, while at the city of Plymouth in the month of December, 1905, after the death of George W. Corbett, request of M. C. Mead, the attorney for the plaintiff and beneficiary, that the plaintiff furnish proofs of death of the deceased in accordance with the by-laws of defendant corporation? *A.* Yes."

Motions and rulings were made and exceptions taken preserving for review the questions discussed in the opinion. Judgment was rendered in favor of plaintiff, from which this appeal was taken.

For the appellant there were briefs by *O'Neill & Gilbert* and *Benfey & Benfey,* attorneys, and oral argument by *William O. Gilbert* and *Theodore Benfey.*

*M. C. Mead,* for the respondent.

The following opinion was filed March 10, 1908:

MARSHALL, J. At the threshold in the consideration of this case is presented the question of whether a defendant can challenge the jurisdiction of the court in which he is cited to appear, upon the ground that the summons in the action was not efficiently served, and failing in that can submit to a trial upon the merits and in case of an adverse decision can, on appeal, have the benefit of the objection made at the start. Counsel for appellant refer to our statute and that of the state of Nebraska and decisions in respect to the latter and draw the conclusion therefrom that such a course is proper.

As we view the case we need not follow and endeavor to answer counsel's argument in detail on the jurisdictional question, because it is firmly settled in respondent's favor by numerous decisions of this court. *Lowe v. Stringham,* 14 Wis. 222; *Grantier v. Rosecrance,* 27 Wis. 488; *Blackwood v. Jones,* 27 Wis. 498; *Anderson v. Coburn,* 27 Wis. 558; *Ins. Co. of N. A. v. Swineford,* 28 Wis. 257; *Alderson v. White,* 32 Wis. 308; *Dikeman v. Struck,* 76 Wis. 332, 45 N. W. 118. The following language by DIXON, C. J., in *Alderson v. White, supra,* referred to by counsel for respondent, is often quoted as an unmistakable indication of the doctrine prevailing in this state:

"The party seeking to take advantage of want of jurisdiction in every such case, must object on that ground alone, and keep out of court for every other purpose. If he goes in for any purpose incompatible with the supposition that

the court has no power or jurisdiction on account of defect-
ive service of process upon him, he goes in and submits for
all the purposes of personal jurisdiction with respect to him-
self, and cannot afterwards be heard to make the objection.
It is a general appearance on his part, equivalent in its effect
to proof of due personal service of process."

It will be thus seen that the right to proceed to a trial on
the merits after a decision against the defendant on the juris-
dictional question, efficiently saving an objection to the ruling
in that regard, is not recognized as having any place in our
practice. The quoted language was only a reiteration, in ef-
fect, of what was said in *Lowe v. Stringham, supra.* There
the doctrine which has from the start prevailed here, was
thus plainly stated in these words:

"We think it is also a waiver of such a defect for the
party, after making his objection, to plead and go to trial on
the merits. To allow him to do this, would be to give him
this advantage. After objecting that he was not properly in
court, he could go in, take his chance of a trial on the merits,
and if it resulted in his favor, insist upon the judgment as
good for his benefit, but if it resulted against him, he could
set it all aside upon the ground that he had never been prop-
erly got into court at all. If a party wishes to insist upon
the objection that he is not in court, he must keep out for all
purposes except to make that objection."

We recognize that there are very respectable authorities to
the contrary of the foregoing, among which are the following:
*Harkness v. Hyde,* 98 U. S. 476; *Miner v. Francis,* 3 N.
Dak. 549, 58 N. W. 343; 2 Ency. Pl. & Pr. 629, 630, and
note 1. However, it is believed that the great weight of au-
thority, or at least the better reasoning, is the other way.
These are but a few of the many cases that might be cited in
support of that: *In re Clarke,* 125 Cal. 388, 392, 58 Pac. 22;
*Manhard v. Schott,* 37 Mich. 234; *Stevens v. Harris,* 99
Mich. 230, 58 N. W. 230; *Union Pac. R. Co. v. De Busk,* 12
Colo. 294, 20 Pac. 752; *Lord v. Hendrie & B. Mfg. Co.* 13

Colo. 393, 22 Pac. 782; *Ruby Chief M. & M. Co. v. Gurley,* 17 Colo. 199, 29 Pac. 668; *Stephens v. Bradley,* 24 Fla. 201, 3 South. 415; *Thayer v. Dove,* 8 Blackf. 567; *Kronski v. Mo. Pac. R. Co.* 77 Mo. 362.

It should be noted in passing that in the early case of *Lowe v. Stringham,* 14 Wis. 222, one of the very early and leading cases on the subject, *Thayer v. Dove, supra,* was referred to for the correct practice, showing that this court considerately adopted such practice as the better one.

We note that early California cases are cited in 2 Ency. Pl. & Pr. 630, as opposed to the practice here favored. The author failed to note that such cases were considered and overruled in *In re Clarke, supra.* We may well quote the language of the court in respect to the matter, showing, as it does, that after adhering to the practice for which appellant contends for many years, it was abandoned as illogical:

"As a rule one cannot avail himself of the advantage of being a party and escape the responsibilities. Some early cases in this state (*Deidesheimer v. Brown,* 8 Cal. 339, and *Lyman v. Milton,* 44 Cal. 630) seem to hold that a defendant, having first objected to the process or service by which he was brought in, may then, if his objections are overruled, answer to the merits, and on appeal from the judgment still avail himself of his objections to the jurisdiction of the court over him. This rule seems unjust and illogical, and I think does not prevail elsewhere. It gives the defendant, whose objections to the jurisdiction of the court have been erroneously overruled, an opportunity to go to trial, and if the judgment is favorable to abide by it, while if it is unfavorable he can procure a reversal. The plaintiff would have no such advantage."

The question is presented as to whether, independently of the rule above discussed, appellant is not precluded by the doctrine of estoppel from questioning the validity of the service upon the commissioner of insurance. There is ground in principle for holding, and considerable authority to the

effect, that by making insurance contracts with citizens of this state, as the appellant did, it held itself out as having complied with the law rendering the commissioner competent to receive service of a summons in an action against it in such a case as this; that such holding out as regards one not having knowledge of the facts nor being negligently ignorant thereof, is as effective as regards the status of such commissioner as such compliance in fact would be.    We do not need to decide, and therefore forego deciding, that question, though we will cite in passing the authorities called to our attention on the subject.    *Ehrman v. Teutonia Ins. Co.* 1 Fed. 471; *Knapp, Stout & Co. Co. v. Nat. Mut. F. Ins. Co.* 30 Fed. 607; *Dixon v. Order of Railway Conductors,* 49 Fed. 910; *Old Wayne Mut. Life Asso. v. McDonough,* 204 U. S. 8, 27 Sup. Ct. 236, and cases therein referred to.

The language of the court, speaking by Mr. Justice Harlan, in the last case cited is quite significant if the making of insurance contracts using the United States mail as a medium of communication between the foreign and the domestic party is, in a proper sense, the doing of business within the state under sec. 1978, Stats. (1898), which point we do not now decide:

"Undoubtedly, it was competent for Pennsylvania to declare that no insurance corporation should transact business within its limits without filing the written stipulation specified in its statute. . . . It is equally true that if an insurance corporation of another state transacts business in Pennsylvania without complying with its provisions it will be deemed to have assented to any valid terms prescribed by that commonwealth as a condition of its right to do business there; and it will be estopped to say that it had not done what it should have done in order that it might lawfully enter that commonwealth and there exert its corporate powers."

The next proposition requiring consideration is this: The contract of insurance being within the prohibition of sec.

1978, Stats. (1898), is it enforceable in the courts of this state? Such statute is as follows:

"No corporation, association, partnership or individual shall do any business of insurance of any kind, or make any guaranty, contract or pledge for the payment of annuities or endowments of money to the families or representatives of any policy or certificate holder, or the like, in this state or with any resident of this state, except according to the conditions and restrictions of these statutes. . . ."

Thus it will be seen that since the appellant never qualified to do business in this state nor to make any contract of insurance with a citizen of this state, it violated the law. It is useless to argue that the act of contracting, using the United States mails as a medium of negotiation between the party without and the party within the state, did not constitute a wrong on appellant's part because it was not the doing of business within this state. We do not need to discuss whether what occurred was or was not the doing of business. It is sufficient for the case that appellant was unequivocally prohibited from making any insurance contract with a resident of this state, except upon condition precedent of its having fully qualified itself to do business within the state. The making of the contract rendered appellant a lawbreaker whether there was any way of punishing it for its infraction or not, except by treating it as an outlaw upon its invoking the use of our courts for redress for some wrong to it growing out of, or connected with, the prohibitive transaction.

Very much of the argument on the part of appellant's counsel is upon the theory that appellant in dealing, as it did, with many residents of this state, including the assured, must be regarded as perfectly innocent so far as our law is concerned, since, forsooth, it asks nothing of the state and is not amenable to its laws because it has never in fact submitted to the state jurisdiction as conditioned by statute. Counsel's logic, it seems, is fallacious. It wholly overlooks the fact that

the prohibition of the statute is directed against the assurer and covers precisely such acts as the one in question. It is wrongly assumed that such a violation is not a wrong at all because the guilty party in the transaction, named in the statute, was at the time thereof outside of our jurisdiction and there is no express basis in the law for penalizing its act as an offense against the public. There is no escaping the conclusion, it seems, applying one's reason to the plain words of the law, that appellant in negotiating with the assured and issuing to him the beneficiary certificate held itself out as qualified to do so and by such false pretense committed a fraud upon the assured, if he was excusably an innocent participant in the transaction. It must be kept prominently in view, as indicated, that the prohibition of the statute is solely against the assurer. Therefore, in case of a violation, such as the one in question, the assurer is solely the guilty party, unless the assured knows, or is chargeable with knowledge, of the facts in regard to the capacity of the former to legally enter into the transaction. The admission counsel makes, and could not avoid making, that the association violated the statute, in connection with the claim that it nevertheless committed no wrong because it kept out of the reach of the state's jurisdiction, is a *non sequitur*.

The foregoing suggests the importance in this case of several very familiar elementary principles to which we may well refer.

It is presumed that every one of the age of discretion and of sound mind knows the law. *Ignorantia legis non excusat.* That applies to civil as well as to criminal cases, especially as regards wrongs involving fraud or violation of statutory prohibitions, wrongs which are *malum prohibitum.* Appellant cannot escape the full force of that principle upon the ground that the law of Wisconsin as to it was foreign, because state restrictions upon insurance business by foreign corporations are so universal that it must be presumed that one circumstanced as appellant was respecting the transaction under con-

sideration knows, or at least has reasonable ground to know, not only that statutory conditions exist regarding its capacity under the laws of the state to make such contracts, but that an assured, in the absence of information to the contrary, would reasonably expect the contract to be made with reference to the law bearing on its validity. Where a foreign makes a contract with a domestic person and the right to do so is regulated by the law of the domicile of the latter, the former is presumed to know such law. *Huthsing v. Bosquet*, 3 McCrary, 569, 17 Fed. 54.

The next elementary principle applying significantly to the facts here, is that violations of civil as well as criminal law are presumed against. *Norton v. Kearney*, 10 Wis. 443; *Law v. Grant*, 37 Wis. 548; 22 Am. & Eng. Ency. of Law (2d ed.) 1280–1282. The text at the latter citation, supported by numerous authorities, so well states the rule that we cannot well do better than to quote it:

"As a general rule, the presumption is that persons act honestly and properly in their business and social relations; or, in other words, there is a presumption against misconduct on the part of individuals. . . . Thus, in an action on a contract, where the validity of the contract depends on the question whether one of the parties thereto was licensed to transact the particular business to which the contract related, it will be presumed that he was duly licensed."

The next significant principle, very obvious from the language of the statute under consideration, and so unequivocally recognized by courts as to be now classed as elementary, is that the dominant purpose of such a law is to protect residents of the state who might be induced to patronize foreign insurance companies. To inflict a loss upon the citizen who has innocently contracted with such a company would be equivalent to holding that the legislature, while ostensibly extending protection to domestic persons, placed one of the most efficient weapons that could have been designed in the hands of foreign parties to perpetrate frauds. Such a result, manifestly, should not be held to be the one

intended in the absence of plain unmistakable language to
that effect, either in the literal sense of the words used or by
necessary inference therefrom.   That doctrine was clearly
recognized and discussed at length in two recent cases de-
cided by this court.   *Urwan v. N. W. Nat. L. Ins. Co.* 125
Wis. 349, 103 N. W. 1102, and *Laun v. Pac. Mut. L. Ins.
Co.* 131 Wis. 555, 111 N. W. 660.   In the latter case, in
harmony with familiar principles and the general trend of
decisions elsewhere, this court, speaking by Mr. Justice Tim-
lin, laid down the rule to be applied to such statutes as the
one in question, in these words:

"The subject matter of the legislation must also be consid-
ered and the effect upon innocent third parties of holding the
contract void.   It is then considered whether to hold the re-
sulting contract void would not rather encourage than dis-
courage violations of the statute by allowing the guilty party
who alone is subject to the sanction of the statute to profit
by his breach of the law.   And further the court should con-
sider what class of persons or interests the statute is intended
to protect, and whether that protection is defeated by holding
the contract void.   From all these considerations, aided by
sound rules of interpretation wherever applicable, the court
deduces and gives effect to the legislative intention in this
respect in all cases in which the statute has not expressly de-
clared the contract to be void."

Up to this point, under the facts of this case, it seems to
be established that appellant in entering into the relations it
did with the assured, knew that it was violating the law of
this state.   By the plain words of the law, and on principle,
it was inexcusably a wrongdoer.   At the same time the as-
sured, so far as the record shows, had a right to assume that
appellant had complied with the law.   As we have indicated,
there being no express prohibition in the statute as to him,
there could have been no wrong on his part except by know-
ingly or negligently co-operating with the appellant to violate
it.   It does not seem that the mere circumstance that the
communications between the parties were by means of the

United States mail efficiently impairs the presumption, from the standpoint of the assured, that appellant was what it assumed to be in entering into the contract, to wit, a duly licensed corporation to transact such business.

It has been expressly held in many jurisdictions that when a foreign insurance corporation offers to contract with the citizen of a state the latter has a right to rely upon the former having complied with the law and so is not obliged to make any investigation in that regard. Principle, illustrated by the authorities cited in the able brief of respondent's counsel and many others, very conclusively supports that. *Swan v. Watertown F. Ins. Co.* 96 Pa. St. 37; *Lasher v. Stimson,* 145 Pa. St. 30, 22 Atl. 552; *Union Mut. L. Ins. Co. v. McMillen,* 24 Ohio St. 67, 79; *Ehrman v. Teutonia Ins. Co.* 1 Fed. 471; *Berry v. Knights Templars' & M. L. Ind. Co.* 46 Fed. 439; *Diamond P. G. Co. v. Minneapolis Mut. F. Ins. Co.* 55 Fed. 27; *Ganser v. Firemen's Fund Ins. Co.* 34 Minn. 372, 25 N. W. 943; *Seamans v. Christian Bros. M. Co.* 66 Minn. 205, 68 N. W. 1065; *Watertown F. Ins. Co. v. Rust,* 141 Ill. 85, 30 N. E. 772; *Brooklyn L. Ins. Co. v. Bledsoe,* 52 Ala. 538; *Sparks v. Nat. M. Acc. Asso.* 100 Iowa, 458, 69 N. W. 678; *Marshall v. Reading F. Ins. Co.* 78 Hun, 83, 29 N. Y. Supp. 334.

From these authorities and the elementary principles they illustrate we deduce this as the rule governing this class of cases as regards sec. 1978, Stats. (1898): A resident of this state while in this state, with whom a foreign insurance company offers to contract, in the absence of actual or constructive knowledge to the contrary, may safely rely upon the pretense involved in such offer that such company is competent to so contract. In case of a contract of insurance being made with a resident of this state while therein, and maturing, the corporation cannot avoid complying with it by putting up as a shield its own violation of the statute prohibiting it from making such contract.

From the foregoing no reason is perceived why, on grounds of public policy, judicial assistance should be refused respondent to enforce the insurance contract in question. The policy of the statute is, as indicated, to safeguard domestic persons. Therefore, it is satisfied rather than violated by lending judicial aid to one of such persons who would otherwise be most grievously defrauded in the name of the law. Courts cannot look otherwise than with disfavor upon the act of a foreign insurance company which has knowingly violated the domestic law by making a contract of insurance with a resident of this state in the face of a plain prohibition and expressly against it only, the assured not being within the inhibition except, as we have stated, by implication that he shall neither knowingly nor negligently participate in the transaction, and in the given case being free from actual or constructive knowledge of the violation, and after taking the money from its victim from time to time till the maturity of the contract, invokes the very law it has set at defiance to escape its obligation to the beneficiary, for the protection of whom the assured, no longer at hand to safeguard, in good faith paid. A legislative purpose favorable to such a result would so offend against one's sense of justice that anything short of an unmistakable legislative command to that effect could enable us to appreciate it to be the will of the lawmaking power. The command in this case by reasonable inference goes no further than that judicial recognition of the prohibited contract shall not be given to aid the assurer adversely to the assured in any case, nor recognition of the contract as enforceable upon either side in case of the parties being *in pari delicto*, which status can only exist by actual or constructive knowledge on the part of the assured at the time of making the contract of incompetency on the part of the assurer to make the same. If the legislature intended the law to go further it could easily have done so. It could have expressly prohibited the assured as well as the

assurer from entering into such a transaction as the one under consideration, except upon condition precedent of the latter having complied with the laws of this state on the subject, and provided that the former should be chargeable with knowledge of the fact as to such competency. It could have provided that the prohibited contract should be wholly void as to both parties to the transaction. It could have in other ways rendered unmistakable, disability of the assured under any circumstances to enforce the prohibited contract in the courts of this state. It has done neither, nor done anything indicating, reasonably, or raising a well-grounded suspicion of, a purpose to close the portals of the courts to residents of this state, under such circumstances as we have here, thus enabling a foreign corporation to receive and retain from one of such residents consideration for a promise and escape rendering the agreed equivalent therefor.

There being no ground of public policy, as we have seen, why the court should, on its own initiative or upon suggestion, refuse to lend judicial aid for the enforcement of such a contract as the one in hand, the plainest principle of estoppel operates to prevent appellant from invoking its own wrong to relieve itself from liability,—that supreme equity in the law which stands guard, so to speak, in all courts, that one shall not be permitted to falsely assume one character for the purpose of entering into contractual relations with another, reasonably calculated to, and which does, deceive such other without his fault into efficiently co-operating to produce such result, and then shift to an inconsistent attitude for the purpose of avoiding his obligation, to that other's injury. The law will not recognize any such change of position, but will strictly hold such person responsible according to the pretenses which induced such other to act.

On both the question of public policy and the one of estoppel under such a statute and in face of such facts as we have to deal with here we fully approve of this text in Judge

522     SUPREME COURT OF WISCONSIN.     [MAY

Corbett v. Physicians' Casualty Asso. 135 Wis. 505.

Thompson's work on Corporations at sec. 7960, deduced from authorities cited, and quoted to us by respondent's counsel:

"The plaintiff may rightfully presume that the defendant has complied with the statutes entitling it to do business within the state.  It has been observed that one of the objects of such statutes is the protection of the people against worthless foreign companies; and that, as the domestic citizen is not required to see that the foreign corporation has observed the laws before he enters into a contract with it, there is no reason, founded in public policy, which will enable a solvent foreign corporation which has violated the domestic law in making contracts and receiving the consideration therefor from an innocent citizen, to escape liability for its performance by setting up its own turpitude."

The result of the foregoing is that the contract in question was valid at its inception and was enforceable in this state at the time of the commencement of this action if Corbett was a member of the association in good standing at the time he was injured, and that the court obtained jurisdiction, both as to the person of appellant and the subject matter involved.

We now come to the questions respecting whether Corbett kept the insurance certificate in force up to the time he was fatally injured.  If he did, questions of waiver discussed in the briefs of counsel need not be considered.

At this point we repeat to some extent what is shown by the statement.  Mr. Elliott, the secretary and treasurer of appellant, whose duty it was, according to the evidence, to receive all dues upon memberships and in fact did receive at the home office in Omaha, Nebraska, the payments on the membership in question, including that due December 10, 1905, visited this state after Corbett's death, duly authorized to investigate the merits of respondent's claim.  He was called for the respondent on the trial as an adverse witness.  In the course of his testimony he stated that a letter dated December 13, 1905, purporting to have been written and signed, all in typewriting, by Corbett, inclos-

ing a check purporting to have.been drawn and signed by him, December 10, 1905, for payment of his membership fee due on that date, was received by appellant at Omaha, Nebraska, December 16, 1905, and was in due course collected, appellant having no knowledge of the injury to Corbett till after the check was used as its property. The envelope was not produced and that circumstance was accounted for upon the ground that it was destroyed as was customary. Under the insurance contract and the custom of doing business by the appellant, as is conceded, if the letter containing the check was deposited in the postoffice at Corbett's home in Wisconsin and received by appellant at Omaha, Nebraska, before he was injured, as the jury found, barring questions which have been decided in respondent's favor, she was entitled to recover. In that respect the evidence of Elliott had a very material bearing on the case. A witness was permitted to testify in respondent's behalf under objection and on the assurance of respondent's counsel that the evidence was offered for purposes of impeachment only, that Elliott stated to him on the occasion of the aforesaid visit to this state, that Corbett's letter containing the check was received by appellant at the home office on the 14th day of December, 1905. A second witness was permitted to testify under objection to the same effect. We are satisfied from the record that appellant's counsel is correct in the claim that the evidence of both witnesses was offered and received for purposes of impeachment only and that it was so understood at the close of the trial by all participants therein. So the question of whether such evidence was competent to prove admissions by the corporation need not be considered.

Viewing the evidence as before indicated as to Elliott's declaration inconsistent with his evidence that the check was received December 16, 1905, counsel for appellant insist that the court erred in admitting the same, but we must hold

to the contrary under sec. 4068, Stats. (1898), pursuant to which Elliott was called to testify, which provides as follows:

"Any party to the record in any civil action . . . or the president, secretary or other principal managing agent of any corporation which is such a party . . . may be examined upon the trial . . . at the instance of the adverse party . . . but the party calling for such examination shall not be concluded thereby and may rebut the evidence given thereon by counter or impeaching testimony."

Errors are assigned upon the ground that with the evidence out of the case, except for purposes of impeachment, as to Elliott's statements that he received Corbett's letter and check December 14, 1905, the verdict of the jury as to when such receipt occurred and when the letter was mailed is not supported by the evidence. We have carefully examined all of the evidence in relation to those points. There was much circumstantial evidence proving, or tending to prove, that Corbett drew and signed the check; that according to his custom he made a stub in his check book corresponding to the check; that he wrote the letter with which the check was transmitted, three days before he was injured; that the letter was written on the day of its date; that Corbett deposited the letter in the postoffice; that he must have done so before he was injured because he was unconscious thereafter till he died; that if the letter was so deposited it must have reached Omaha in the regular course of the mail before the time testified to by Elliott, and that his testimony as to the postmark upon the envelope was false. There was evidence warranting the jury in rejecting all of Elliott's testimony as untrue. There was still other circumstantial evidence, sufficient in the whole, as it seems to us, notwithstanding the conflicting evidence, which we need not take time to detail, to carry the questions under discussion to the jury, and that precludes us from disturbing the verdict.

As before indicated, in view of the conclusions already

reached we need not proceed further. The points decided justify the judgment, irrespective of any other question discussed by counsel. Since such other questions are thus rendered unimportant we forego considering them.

*By the Court.*—The judgment is affirmed.

A motion for a rehearing was denied May 8, 1908.